

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 13, 2022

**BY ECF**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re:   *United States v. Fred Asante*, **21 Cr. 88 (JSR)**

Dear Judge Rakoff:

  The defendant in the above-captioned case, Fred Asante, is scheduled to be sentenced on May 18, 2022, at 4:00 p.m., after pleading guilty to conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). The Government respectfully submits this letter in advance of the sentencing.

  As an initial matter, the Government does not have any objections to the Presentence Investigation Report revised on May 10, 2022 (the "PSR"), which determined that the defendant's applicable United States Sentencing Guidelines (the "Guidelines") range is 121 to 151 months' imprisonment and recommended a sentence of 121 months' imprisonment. For the reasons set forth below, the Government respectfully submits that the Court should sentence the defendant to 120 months' imprisonment, which is largely consistent with Probation's recommendation and would be sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

## I.   APPLICABLE LAW

  As the Court is aware, the Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 50).

## II.      DISCUSSION

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports the imposition of a sentence of 120 months' imprisonment.

### A.      The Seriousness of the Defendant's Conduct

First, a sentence of 120 months' imprisonment is necessary to reflect the extremely serious nature of the defendant's conduct and to provide just punishment for the offense. The defendant was the top U.S.-based money launderer for a criminal enterprise (the "Enterprise") based in West Africa that was involved in defrauding American businesses and individuals through business email compromises, romance scams, and fraud schemes related to the novel coronavirus/COVID-19 pandemic, the general details of which are discussed at length in the PSR. (*See* PSR ¶¶ 15-20, 22.) The defendant served an integral role in the conspiracy, as the Enterprise needed U.S.-based bank accounts to receive and launder fraud proceeds from victims in order to avoid arousing suspicion, rather than having the proceeds sent directly abroad to Ghana.

Based on information known to the Government, the defendant – a convicted federal felon who was on supervised release through March 2013 – was a member of the conspiracy for at least approximately five years, from at least September 2016 through when he was arrested in February 2021. (*Id.* ¶ 22.) Over those five years, the defendant opened and maintained a staggering *19 bank accounts* at more than 10 different banks as part of his money laundering operation. (*Id.*) Thirteen of those accounts were business accounts opened in the name of Asante's company Fog Logistics LLC, a company opened in February 2019 and represented to banks as a purported transportation, logistics, and import/export company; another business account was opened in the name of Asante's company First Trading Logistics, which was opened in October 2020; another business account was opened in the name of Asante's company Gold Express LLC, which was opened in July 2017; and the other four accounts were personal accounts controlled by Asante. (*Id.* ¶¶ 21-22.) The reason Asante had so many accounts is because they were regularly being closed by banks due to the fraud. Asante was persistent, however, in opening new accounts to continue his money laundering operation after banks closed his accounts. At the time of his arrest in February 2021, 14 out of Asante's 19 bank accounts had been closed.

While the defendant represented to financial institutions that his companies were involved in legitimate business such as transportation and logistics, in reality they were simply fronts that the defendant used to receive funds stolen from victims and launder them to co-conspirators based abroad. (*Id.*) But the defendant did not only receive fraud proceeds under the guise of legitimate businesses, he also laundered that money back to Ghana through large purchases of food products, cars, and other products which were shipped to Ghana and sold, resulting in "clean" largely untraceable money that was distributed to Asante's coconspirators in the Enterprise. (*Id.* ¶¶ 20-21.) This trade-based money laundering scheme was specifically designed to obscure the origin of the fraud proceeds and was successful in concealing the identity of the ultimate beneficiaries of these schemes. (*Id.*) Indeed, the Government is not aware of any legitimate purpose for Asante's businesses and has not identified any legitimate transactions in his accounts.

In total, Asante's bank accounts had deposits that totaled approximately $36.4 million during the 4.5-year period from September 2016 through January 2021, a significant portion of which consisted of cash deposits which are almost impossible to trace. (*Id.* ¶ 22.) To date, the Government has been able to determine that the defendant received at least approximately $6.7 million in fraud proceeds from more than *80 victims* through his bank accounts. (*Id.* ¶ 23.) The defendant made a profit of at least approximately $647,000 from his involvement in the conspiracy, which he has agreed to forfeit. (*Id.* ¶ 98.)[1] While the defendant claims to have paid filed U.S. income tax returns and paid taxes (*id.* ¶ 83), he only appears to have reported his legitimate income, which was less than $60,000 in tax years 2016 through 2018 and approximately $75,000 in personal and business income in tax year 2019.

---

[1] The defendant further agreed to forfeit a 2021 Mercedes-Benz GLE AMG which was purchased with fraud proceeds. (PSR ¶ 98.)

Importantly, based on a review of Asante's cellphone seized at the time of his arrest, he communicated extensively with other members of the Enterprise in connection with the conspiracy, demonstrating his full awareness of the frauds being committed that resulted in millions of dollars being deposited in his accounts and his goal in being a top money launderer for the Enterprise.  For example:

- April 21, 2020:  When one coconspirator was causing issues with Asante's accounts, presumably because high-risk fraud proceeds were being deposited, Asante texted his associate, in substance and in part:  "Please if this guy b[r]ing any future problems to my account . . . I will hunt him down in Ghana . . . tell him."

- June 12, 2020:  In a text message conversation with a coconspirator who expressed feeling "safe" when receiving money from Asante's accounts and how "U can't trust these guys sometimes," Asante responded, in substance and in part, as follows:  "Yes . . . ooo.  They all fraud boys.  Me I buy from them.  So I take the risk on my part to save u from all harmful situations."

- July 8, 2020:  Asante texts a coconspirator the following, in substance and in part:  "I can't do no international wire no more.  Unless I [g]et new account.  Yesterday one of sig guy gave me $80k . . . Dem say it was hacking money . . . immediately it hit my account then closed my account."

- July 15, 2020:  A coconspirator texts Asante photos of a wire transfer request from a victim, which indicates the victim is sending Asante's company Fog Logistics $52,000 for "equipment rental for development project."

- August 25, 2020:  When discussing deposits from a particular victim, Asante advised a coconspirator, in substance and in part, that the bank "said they will accept money from this company no more."

- January 20, 2021:  In a text message conversation weeks before his arrest, Asante sends photos of blank checks from a victim that he filled out to his company Fog Logistics and deposited into his accounts for approximately $40,000.

- January 26, 2021:  Asante texts a coconspirator photos of the driver's license of a victim who deposited over $100,000 into Asante's accounts.

- February 12, 2021:  One week prior to his arrest, Asante texts a coconspirator, in substance and in part:  "I need that big money. . . . they close my account."

- February 13, 2021:  In an effort to release a large amount of fraud proceeds in Asante's account that was frozen by a bank, Asante instructs a coconspirator what a female victim should be coached to say to the bank to release the funds:  "Whatever they need here her husband buys from me and she pays me and all

money sent are legitimate and I have no wrong doing in it . . . Guy [from bank]
will ask a lot of questions so she needs to be ready and prepared to talk well.
Please there's a lot of money stuck there . . . which was supposed to clear and go
out on Tuesday." Subsequently, Asante refers to the bank employee looking into
these fraudulent transactions as "very stupid."

These text message excerpts demonstrate that Asante was a key member and leader of the U.S.-
based money laundering operation for the Enterprise. He even had enough experience and
sophistication to advise a coconspirator on what a victim should say to the bank in order to
convince the bank to release fraud proceeds.

As described above, this extensive conduct by the defendant over approximately five
years in laundering more than at least approximately $6.7 million in *identified* fraud proceeds
from more than 80 victims and conspiring with others to do the same is extremely serious. Real
victims, many of whom were vulnerable older men and women, were hurt by the crimes
committed by the defendant and his role in the conspiracy, which was integral to committing the
frauds and getting the money to co-conspirators in Ghana. (*See* PSR ¶¶    The impact statements
submitted in this case by victims who sent money to Asante demonstrate the true harm caused by
the defendant's criminal conduct. For example:

- "Mark [the online identity impersonated by a member of the Enterprise] begged
  me to sell my home. I have many loving emails from him. He took such
  advantage of me. . . . It was the worse thing that ever happened to me." "I
  already drained my children's inheritance . . . and my bank accounts." "This man
  had not only taken $350,000 in cash which is an estimate. He ruined my credit. I
  was unable to grieve my mother's death. I have kept secrets from my children. I
  had to rebuild my life all over again at a very older age. It's very hard for me to
  trust. I don't answer calls unless it's family. I will never touch the computer
  again." (Victim Statement 1.)

- "I am writing this in regards to the sentencing of the schemers who took
  advantage of my mother at her most vulnerable time and effectively broke up my
  family. . . . After a year of grieving [her husband's death] my mom decided to
  join a dating app. She had never dated any man other than my father, as she got
  with him when she was only 15 years old, and had no idea how evil the world
  could be. . . . [My mother] decided she needed to go back to work since sending
  this man 25k of the only money she had left to retire on at 58 years old. Our
  family has been split apart and I don't foresee it ever being made whole. . . . My
  mom has never returned to the dating world since this happened, she has been
  traumatized by this nightmare. I do not want my mother to grow old alone but
  there is a chance that will be her fate." (Victim Statement 2.)

- "Mr. Asante and the group of people that worked with him have defrauded me
  out of over $125,000. This greatly affected my financial situation. . . . I had to
  sell my dream house that I worked extremely hard for . . . The emotional impact

has been extreme humiliation that this has happened and that I was lied to for so
long. . . . I've lost trust in people in general. The stress of having to pay back all
that money has been unbearable. . . . I wish I could feel normal again." (Victim
Statement 3.)

- "Prior to this scam, I was a very trusting person, but now I am leary of everyone.
  I was very depressed and upset that I let him take advantage of me and my good
  nature. It took a toll on me mentally for many months and even to this day when I
  think back on it. Financially, I was on the road to retirement having worked very
  hard for many years. This scam has forced me to work longer to rebuild my
  finances." (Victim Statement 5.)

Apart from these individual victims, the defendant was also involved in receiving proceeds from
fraud committed in connection with COVID-19 relief programs, thereby facilitating fraud on the
U.S. Government as well.

In terms of relative culpability, Asante is by far the most culpable defendant of anyone
who has been charged in this case or any related cases. The only defendant to be sentenced in
this case, Lord Aning, received a sentence of two years' imprisonment for laundering
approximately $1.7 million in identified fraud proceeds through eight bank accounts over three
years. Thus, Asante was involved in laundering more than *four times* the amount that Aning did
through more than double the number of bank accounts.[2] Moreover, unlike Aning, Asante has
substantial criminal history, was a leader in the money laundering operation of the Enterprise,
and was fully aware of the nature of the frauds being perpetrated.

For these reasons, the seriousness of the defendant's conduct and the need to provide just
punishment warrant a sentence of 120 months' imprisonment.

### B. The Need for Adequate Specific Deterrence

Second, a sentence of 120 months is necessary for specific deterrence to this defendant.
Asante arrived in the United States from Ghana in 1996 for "a better life and employment
opportunities." (PSR ¶ 60.) Then, beginning in May 2004 through June 2005, the defendant
participated in a drug conspiracy in which he bought and sold large quantities of heroin that was
trafficked from Washington D.C. to New York City. (*Id.* ¶ 48.) He was arrested in February

---

[2] Other money launderers connected to the Enterprise who were charged in a separate case
received lengthy sentences for laundering substantially less money than Asante. *See United
States v. Rufai*, 18 Cr. 201 (DLC) (imposing 70-month sentence for defendant accountable for
loss amount of approximately $2 million who also received leadership enhancement (Deborah
Mensah); imposing 51-month sentence for defendant accountable for loss amount of
approximately $760,000 who also received leadership enhancement (Muftau Adamu); imposing
48 month sentence for defendant accountable for loss amount of approximately $730,000
(Tourey Ahmed Rufai); imposing thirty-month sentence for defendant accountable for a loss
amount of approximately $477,000 (Prince Nana Aggrey)).

2006 in the Eastern District of Virginia and released on bail pending trial. Then, on the eve of trial, the defendant fled to Ghana from where he continued to send packages of heroin to the United States and was additionally charged with failure to appear and another drug charge. (*Id.* ¶ 48.) The defendant ultimately returned to the United States in June 2006, pled guilty to all of these crimes, and was sentenced to 87 months' imprisonment. He was released from federal custody in January 2010 and was on supervised release through March 2013.

Despite receiving a *seven-year* prison sentence, within approximately three years of the termination of his supervised release, the defendant began engaging in the instant offense in September 2016, which he continued for almost the next five years through his arrest in February 2021. Accordingly, for the past 25 years that the defendant has been in the United States, he spent almost half of that time either committing serious federal crimes or serving time in prison. This is a case where specific deterrence is extremely important, as a seven-year prison sentence and another three years of supervised release were not sufficient to deter the defendant from engaging in criminal conduct.

At the time he engaged in the instant offense, Asante was married, had three young children, and was employed earning between $60,000 to $70,000 annually, none of which was the case during his prior narcotics conduct. Nevertheless, despite these family circumstances, the close relationship the defendant has with his three siblings who all reside in Virginia or Washington D.C. (PSR ¶ 62), and the fact that the defendant was certainly aware of the potential legal consequences of his criminal conduct, the defendant chose to engage in the instant offense within three years of the termination of his supervised release, thereby risking his ability to be with his family. There can be only one explanation for this: greed. The massive amounts of money going through Asante's accounts – approximately $36 million – demonstrate that he would not be satisfied with earning a modest living from legitimate employment. Rather, he doubled down, kept opening bank accounts as fast as they were closed, and successfully made himself the top money launderer for the Enterprise in the United States. And he did all of this despite knowing full well the consequences of continuing to commit serious federal crimes. Accordingly, a substantial sentence longer than his previous term of incarceration is necessary to discourage the defendant from committing further crimes and to impress upon him the serious consequences of his criminal conduct.

## C.     The Need for General Deterrence and Respect for the Law

Third, a sentence of 120 months' imprisonment is appropriate to ensure adequate general deterrence and to promote respect for the law. A substantial prison sentence is necessary to send a message to other similarly situated individuals and the public that participating in business email compromises, romance scams, and pandemic fraud in any capacity, and laundering proceeds from those frauds, will not be treated leniently and will entail a significant period of incarceration. Such a message is particularly important at a time when such crimes, which are often difficult to prosecute, have become commonplace. Indeed, in a recent report, the Federal Trade Commission estimated that victims of romance scams in the United States have collectively lost over $1.3 billion over the last five years; in 2021 alone, reported losses to romance scams reached a record $547 million, up about 80% from 2020, which is higher than

any other FTC fraud category.[3]  The Better Business Bureau reports that "the number of reported romance scam cases has already more than doubled in the first two months of the year when compared to the same period last year."[4]  Further, based on data collected by the FBI, in 2020 alone, U.S. victims lost a total of approximately $1.8 billion to business email compromises.[5]  It is therefore important that those who would consider engaging in these forms of criminal conduct understand that the consequences will be serious.  Accordingly, a substantial sentence of 120 months' imprisonment is both necessary and appropriate to promote general deterrence and respect for the law.

### D.      The Defendant's Statement About His Criminal Conduct

Prior to his plea of guilty, in December 2021, the defendant mailed a *pro se* letter to the Government which he hoped would enable the Government "to understand who I am and finally come to understanding of what . . . happened from 2017 to 2021 and also understand my motive and efforts of everything which happened."  The letter is attached hereto as Exhibit A in its entirety.  While the letter was written prior to the defendant's acceptance of responsibility for his conduct, it is notable in several respects, because it provides insight into the defendant's own view of his criminal conduct after he had been in custody for approximately 10 months.

As an initial matter, the letter demonstrates that the defendant was fully aware on multiple occasions that his accounts were receiving fraud proceeds because banks were constantly closing his accounts due to fraud.  Nevertheless, the defendant continued to open new bank accounts to continue his money laundering operation.  For example:

- "After I returned back from trip, [a bank] noticed me that some funds I received into my account was fraud money so they closing my accounts, which then I went to [another bank] and open account but that account was close[d] within one within one week without a reason given.  (Ex. A at 4.)

- "2017 I opened a business company because banks was complaining that I using my personal account for business, so I opened Gold Express then after someone paid money into the account and the money was reported fraud, I closed the account and closed the business down."  (Ex. A at 5.)

- "I never questioned anyone on who is paying me unless my bank question me or the funds or my account is closed."  (*Id.*)

Throughout the letter, the defendant also repeatedly tries to explain that his conduct was almost altruistic – that he was simply trying to "help" other people.  For example:

---

[3] *See* https://www.ftc.gov/news-events/blogs/data-spotlight/2022/02/reports-romance-scams-hit-record-highs-2021.

[4] https://www.bbb.org/article/scams/17012-bbb-tip-romance-scams.

[5] *See* https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf.

- "Most of the payment I made and most of the international transfers I did was not even for me and I did not even gain an[y] profit out of it. I was doing [it] all to help most of my customers which was buy cars from me because I felt, the more I help them the more my car business was growing and my name was getting out there because of my loyalty to people." (Ex. A at 4-5.)

- "Everything I did was just to help people by negotiating rate. I never thought in my head that I was doing money laundering. All I always thought was that am helping people negotiating rate back and forth and at the same time my business was growing and a lot of people was buying cars from me." (Ex. A at 6.)

- "All I did was help people and most of my business partners" (Ex. A at 8.)

- I was just used thinking I was just trying to help people." (Ex. A at 9.)

- "All I did was asked for money on black market under good rate so people can avoid transferring their money from Ghana to around the world." (*Id.*)

These statements demonstrate that despite being arrested on new federal charges and in custody for 10 months, the defendant did not appreciate the seriousness of his criminal conduct at this time. Notably, at no place in the letter does the defendant acknowledge the incredible harm that his conduct caused to dozens of victims.

Finally, in reference to the defendant's prior incarceration, the defendant stated: "I learnt my lesson on my first prison time and I will never do anything to go back to prison but unfortunately this had catch up to me now." (Ex A. at 8.) The defendant is right. Unfortunately for him, the defendant's commission of a multi-million dollar money laundering scheme for almost five years has clearly demonstrated that he did not, in fact, learn from his prior lengthy term of incarceration.

## III.    CONCLUSION

For the reasons set forth above, Government respectfully submits that a sentence of 120 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing and would be fair and appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Sagar K. Ravi / Mitzi Steiner
Assistant United States Attorneys
(212) 637-2195 / 2284

# EXHIBIT A

Hello,

I pray and hope by the time you finish reading this letter, you will come to understand who I am and finally come to understanding of what extra happened from 2017 to 2021 and also understand my motive and efforts of everything which happened.

2009 about, I was release from prison after serving 36 months NOT 87 months. Upon my released I optained a job at Giant Foods and Target superstore, I worked 2 full time jobs daily, plus a parttime cleaning service for a school at falls church virginia. (ULTIMATE HEALTH)

I was living with my family then so I did not had that much bills to pay but my cell phone bill, so which allows me to save as much money I could, if am not mistaken I saved about around $25000.00 to 30000.00 from 2009 to 2014.

Around 2011 I met my wife now and about 2012 we had our first baby girl, but we was still living with my mother and brother in the same apartment because at that time my credit was not good enough to get a house and also our income was not good as well for us to raise a child and pay all the bills and babysitting timing.

If I am not mistaken, around ending of 2012 to the beginning of 2013, I obtained a job at a maintenance company called (LANE VALENTE), then I started learning hands on trade for myself, therefore I decided to go to trade school and learn of HVAC and optained my Universal License,

USAO_AS_00003095

which I did, then I was able to get an engineering work with Emcor Services working as HVAC engineering inside a building at Herndon Virginia. Emcor Services lost it contract for building engineering to Lincoln Properties and since I was very had working guy there, I was able to maintain my job under the new company at the same building at Herndon Virginia on Worldgate dr.

On about 2015 I had pretty much a bit of savings saved up from my job and my tax returns money, about $50000.00 roughly, therefore I wanted something to do with that money so I consulted one of my friend which I knew from the past, which was doing car business export to Africa Ghana. After spoke to him and getting understanding in business, I decided to get involved of the exporting business and also selling cars on craiglist. I bought 2009 hyundia elentra and 2012 Nissian sentra, then I shipped it to Ghana Africa, After the cars reached Ghana I was able to sell for doulb the price I bought it for in America. After those sales I end up buying 2011 Lexus IS250 with all the money including my profit I gained of those two cars. After I shipped the Lexus and it reached Ghana and since that car was too Luxury then, it took me a while to sell that car, so I end up selling that car for doulb of what I paid for as well but I ended up having very difficults with bringing my money back to America because if I am not mistakenly the full amount was $45000.00

The person who bought the Lexus from me saw that I was having it very difficult to get my money back to America because I had never made that sales before. Therefore the person told my car sales guy then that he could pay me the money in America to my bank account if I wanted and since I needed my money quickly I said ok to it then I provided my wells Fargo personal bank account, I never questioned whereabout or who is paying me the funds, all I did was to provided my bank information to my sales guy and within 2 day the money was paid into my wells forgo account, which the money was more than what I was expected so I questioned them on why is the money a lot more then what the car sold for, then I was told they bought another car wanted another car Toyota camry, so I should take my $45000 out of the money and use the rest to buy Toyota camry and also buy some car parts as well (You can reference to my wells fargo account around 2016.

   So now I had found someone who can help me get my money back America for me faster and easy and at the same time that person like to buy a lot of cars and also a lot of expensive shoes and clothing.

   About around ending of 2016, I decided to travel to Ghana to exploy into more other business,

So while I was on my trip, I met alot of other business people, who will like to buy stuff from Sams Club, BJs, Costco, car parts and also who will like to pay for their products in china and around the world (India, China, turkey and Dubia). All this good business people had money in Ghana to do business but they was having very difficult time tranfering their money to the vendors from Ghana because of bank fees and bank rate daily. Most of this people was customers I met through car sales, so they started asking me how I was able to get my money back to america so quickly after my car sales, then explained to a few of them how.

After I returned back from trip, Wells fargo noticed me that some funds I recieved into my account was fraud money so they closing my account, which then I went to Bank of America and open account but that account was close within one week without a reason given.

So I decided to use my Navy Federal account then (most of every transaction I did was at Navy Federal bank 2017 to 2019 mostly) most of the payment I made and most of the international transfers I did was not even for me and I did not even gain and profit out of it. I was doing all to help most of my customers which was buy cars from me because I felt, the more I help them

USAO_AS_00003098

the more my car business was growing and my name was getting out there because of my loyalty to people I was only in the middle of all this transactions just to make sure each person get their money and also my car business was growing. You look into its all my Navy federal and TD bank Statements which shows that I was only taken money from point A to B simply as that, mostly it was just helping people out, the only thing I will always do negotiating good rate for both side.

2017 I opened a car business company because banks was complaining that I using my personal account for business, so I opened Gold Express then after someone paid money into the account and the money was reported fraud, I closed the account and closed the business down and just focus on my regular work and life but still everyday people and friends and business partners will contact me for help on some money issues or they need to pay for something in America or China or somewhere around the world so I could not stop negotiating rate for people, therefore I went back using my TD bank and Navy federal account to help people daily. I helped people with rate negotiating with my personal account all the time, I never questioned anyone on who is paying me or unless my bank question me on the funds or my account is close.

Everything I did was just to help people by negotiating rate. I never thought in my head that I was doing money laundring, all I always thought was that am helping people negotiating rate back and forth and at the same time my business was growing and a lot of people was buying cars from me. I could not stop because everyday you wake up someone will contact you to help them find good rate money to pay for something. I was just caught in between loyalty of people, that's how I see it everyday I wake up.

Around 2019, I decide to quit my regular job was building engineering at capital One Virginia, then I open my business company FOG Logistics.

I went to a wedding around october 2019 which I meant a friend and someone introduced me to him because, he wanted to buy a car to Ghana but his money was not ready then, but he promised me that he will paid the money, the minute the wedding is over and he gets back to Ghana so we made the agreement to buy the car 2020 Lamborgin Urus which cost me $235,000.00, at that time all the money I had on me for my business was $180,000.00 so I end up taking a loan from a company called KABBAGG to support the sales because I didn't have enough money then to buy such a car on my own.

USAO_AS_00003100

so after I was able to buy such car for the person then he felt confident inside me, which made him introduced me to Frozen food business, which he claims that's what he does for work.

He showed me the company he buys from within America the he thought me how that business works but my money was able to buy 8 containers at that time, so I poured every money had into it and all my money got stocked in Ghana, then that's when I had no choice but goes back to the black market and negotiate rate values to get my money here so I can pay the frozen company but at that time I was having issues with BB&T and TD bank on my business account for helping people with transfers so I could not recieved my personal money into my business account.

Therefore the black market guys came up with the idea that, they can pay the frozen company directly for us which I told them to stop because it can cost problems same am having at my bank as of now. Therefore, I decided to open new bank account for my frozen food at HSBC bank.

There is two side to every story, I can not quote it all here, this the basic understanding of what really went on.

USAO_AS_00003101

So please ask yourself, if I was making money or if I was actually doing friend, why will I go and take loans from Lending club, Navy federal and Cabbage. Every money that ever came into my account was for transfer for someone, it was not my money. I never gained any actual money of all this crazy stuff. Most money I can actually claim of all this transfers was about $250,000 to $300,000 for the period of 2017 to 2021. So ask yourself does it worth it to send me to prison for over 10 years for money which I did not actually intended to defraud anyone. All I did was helped people and most of my business partners. You have my cell phone and you can refer to all my text messages. Basically people used me as mule to move their money. I am not a leader of this fraud.

I learnt my lesson on my first prison time and I will never do anything to go back to prison but unfortunately this had catch up to me now.

When I was arrested I did not had no $10000 on me so please stop saying that.

Also stop mention my family because no one actually knew the details of my business. Everything I did, I did by myself, I never thought a day what I was doing was wrong because I was a just a third party to this money and all this transactions

USAO_AS_00003102

I am very sorry for putting myself into this situation and I pray that one day you find a to bring the actual people which did this to justice. I was just was thinking I was just trying to help people. I never talk to anyone about planning fraud. I never spoke to anyone about SBA loan or I had never applied for one. I never knew how this money was planned to come into my account, all I did was use it for transfers for friends and my customers because everyone trusted me to negotiate good rate for them. I am very sorry for what had happen through me but it was never my intention to do wrong to any one. All I did was asked for money on black market under good rate so people can avoid transfering their money from China to around the world. I did not actually made and money out of it compared to the amount which had passed through me, that should tell you that I was just a mule to this people. I am not a criminal, I just keep making bad choices and rest assure this would be my last bad choice in life. God bless you.

Fred Asante

FRED ASANTE
354 DOREMUS AVE.,
NEWMATH NJ 07105

DV DANIELS NJ 070
20 DEC 2021 PM 3 L

PITNEY BOWES
02 1P       $ 007.530
0000807824  DEC 12 2021
MAILED FROM ZIP CODE 07105

SAGAR K. RANI
1 SAINT ANDREWS PLZ
NEW YORK, NY. 10007-1701

10007-170181

USAO_AS_00003104